IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WESTERN MONTANA COMMUNITY PARTNERS, INC., a Montana non-profit corporation; and SPECIAL USE PERMIT FOR PUBLIC RESORT BENEFITS, LLC, a Montana limited liability corporation, | CV 13–282–M–DWM |
| Plaintiffs, | ORDER and OPINION |
| vs. | |
| DEBORAH AUSTIN, Lolo National Forest Supervisor; JULIE KING, Bitterroot National Forest Supervisor; FAYE KRUEGER, Regional Forester of Region One of the U.S. Forest Service; and UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, | |
| Defendants. | |

**INTRODUCTION**

Western Montana Community Partners, Inc. and Special Use Permit for

Public Resort Benefits, LLC (collectively "Plaintiffs") seek a declaratory judgment

that the United States Forest Service's (the "Forest Service") decisions to reject

Plaintiffs' request for a special use permit for a ski area development and to deny

Plaintiffs' request for an administrative appeal are void and of no effect. (Compl.,

Doc. 1 at 27.) Plaintiffs ask the Court to set aside these decisions and remand the

matter to the Forest Service. (*Id.*) Plaintiffs' motion for summary judgment (Doc.

10) is denied, and Defendants' cross motion for summary judgment (Doc. 14) is

granted. Jurisdiction exists under the Administrative Procedure Act because the

Forest Service's denial of Plaintiffs' request for a special use permit constitutes

final agency action and because Plaintiffs exhausted their administrative remedies

under the Forest Service's regulations. For the reasons stated below, the Forest

Service's decision to deny Plaintiffs' request for a special use permit proposal was

not arbitrary and capricious.

## BACKGROUND

**Early studies of skiing in the Lolo Peak Area.**

In the 1960s, President Lyndon Johnson instructed the Forest Service to

"strengthen the cooperative relationship between government and private

enterprise in the field of outdoor recreation." (Doc. 21 at 4.) As a result, the

Forest Service began preparing "feasibility plans" for the development of ski areas

in certain regions of the United States. (*Id.*) In 1965, the Forest Service began

studying the Carlton Ridge-Lolo Peak area (collectively, "the Lolo Peak Area"),

which lies partly within the Lolo National Forest and partly within the Bitterroot National Forest, as a potential site for ski resort development.  (Doc. 17 at 2, 8.) The Forest Service prepared a report in 1965 that identified "strengths and weaknesses" of the Lolo Peak Area for skiing.  (*Id.* at 8.)  A subsequent report dated 1966 found "tremendous potential" for a ski area, including "one of the largest vertical drops and some of the longest ski runs in North America."  (*Id.* at 9.)  The report provided that the potential of the Lolo Peak Area "is so great that it can properly be classified as a national resource."  (*Id.*)  The report recommended further research.  An Assistant Regional Forester stated that "timber will be managed primarily for benefit of skiing."  (*Id.* at 11.)  The reports indicate some concern for whether there was adequate snow depth at lower elevations in the Lolo Peak Area.  (Doc. 21 at 5.)

During the 1970s, the Forest Service took no direct action with respect to development of a ski resort in the Lolo Peak Area.  But a 1971 memorandum from a District Ranger voiced the District Ranger's concerns for ski development in the Lolo Peak Area due to lack of snow, lack of water, soil conditions, high winds, and aesthetics.  (Doc. 17 at 12–13.)

**Creation of the National Forest Plans**.

In 1976, Congress passed the National Forest Management Act ("NFMA").

Pub. L. 94-588, 90 Stat. 2949. NFMA requires the Forest Service to develop forest plans. 16 U.S.C. § 1604(a). Once the Forest Service promulgates a plan for a forest, the Forest Service must issue permits, contracts, and other documents in a manner consistent with the forest plan. 16 U.S.C. § 1604(i).

In April 1986, the Lolo National Forest Plan was approved. (Doc. 21 at 7.) In September 1987, the Bitterroot National Forest Plan was approved. (Doc. 17 at 15.) Although the Lolo National Forest Plan mentions the "potential for a ski area" in the Lolo Peak Area, the Forest Service determined "community ideals and National interests had changed . . . favoring roadless, wilderness, and other resource values." (Doc. 21 at 8.) As a result, the Lolo National Forest Plan did not specifically allocate any lands in the Lolo Peak Area for ski area development. (*Id.*) The Bitterroot National Forest Plan was silent as to skiing in the Lolo Peak Area. (*Id.* at 11.)

During the time the Lolo National Forest Plan was being prepared, the Forest Service designated about 920 acres of the Lolo Peak Area to be a Research Natural Area. (Doc. 17 at 15.) The Carlton Ridge Research Natural Area ("the Research Area") was approved by the Forest Service on June 11, 1987. (*Id.*) The Lolo National Forest Plan anticipated the creation of the Research Area and allocated the 920-acre area to Management Area 6, which provides goals and

standards for Research Natural Areas.  The Lolo National Forest Plan

acknowledged the land surrounding the Research Area has "potential for a ski area

of national class" and the Lolo Peak Area "appears to contain sufficient room for

both opportunities." (*Id.* at 16.)  The Lolo National Forest Plan also provided that

the Research Area proposal "should not preclude the development of the potential

ski area." (*Id.*)  The Research Area includes a number of "ecologically significant

values":

> 1) the most extensive forest of alpine larch in the United States, 2) old
> growth whitebark pine forest, 3) a virtually unique high elevation forest
> occurring on well-developed soils supporting luxuriant undergrowth
> communities which represent a climatic climax of special importance in
> ecological studies, 4) a continuous gradient of timber line, upper
> subalpine, and lower subalpine forest types, 5) a strip of coarse talus and
> bedrock extending down-slope occupied by alpine larch, western larch,
> and their natural hybrids, and 6) an ancient slump supporting an old
> spruce/riparian community containing exceptionally large western large
> trees, and other unique natural features.

(Doc. 21 at 44.)

**Discussion of ski resort development in the late 1980s.**

In the late 1980s, after the promulgation of the Lolo National Forest Plan,

interest in potential ski resort development in the Lolo Peak Area increased.  (*Id.*

at 24–25.)  The Forest Service acknowledged "[t]here is a great deal of interest

among citizens in Missoula regarding a ski area on the Peak, and the climate is

ideal for a deliberate, cautious and thorough assessment of the potential for a

resort on Lolo Peak, conducted by local citizens and government agencies." (*Id.* at 25.) A letter written by the Missoula District Ranger in January 1987 observed that "[l]ocal business persons and elected officials have indicated a desire to discuss this project again." (*Id.* at 26.) The Ranger further wrote, "I see the Forest Service role as a participant, rather than leading the process." (*Id.*)

The Missoula Economic Development Corporation became interested in attracting developers for a ski resort in the Lolo Peak Area. (*Id.* at 22–23.) In November 1987, the Lolo Forest Supervisor wrote a letter to Missoula County, the Missoula Economic Development Corporation, and others, indicating the Forest Service "is, and will remain, neutral on the [ski resort] proposal." (*Id.* at 27.) An internal Forest Service memorandum dated April 18, 1988, stated that "the position of the Lolo Forest is neutral on the ski area development proposal. However, we will support the community in their preliminary effort . . . and are willing to work with the Missoula County Commissioners by sharing our expertise." (*Id.* at 24.)

In October 1988, the Forest Service prepared a document entitled Lolo Peak Ski Area Preliminary Review, which stated the Lolo Peak Area "has the potential for a ski area of national class" and "[n]o fatal flaw has been identified that would preclude ski area development." (Doc. 17 at 28–30.) It also listed concerns, such

as "the lack of reliable snow at lower elevations, the lack of water for snow making, variable soil conditions, prevailing winds, and visuals." (*Id.* at 30.)

In November 1988, a non-binding referendum appeared on the ballot in Missoula County, asking voters if they were interested in the possibility of a three-season resort in the Lolo Peak Area. Sixty-three percent of voters voted in favor of the possibility of the resort. (Doc. 21 at 30); AR905.

In 1989, the Missoula Economic Development Corporation prepared a prospectus entitled "Lolo Peak Resort: An Opportunity Worth Considering" ("the Prospectus"). (Doc. 21 at 22.) The Prospectus encouraged developers to submit proposals, which would be reviewed by Missoula Economic Development Corporation. (*Id.* at 23.) The Prospectus explained that, after reviewing all proposals, the Missoula Economic Development Corporation "will recommend a developer" to the Forest Service and to Missoula County. (*Id.*)

In August 1989, the Forest Service entered into a Memorandum of Understanding with Missoula County and the Montana Department of State Lands for "Joint Review and Analysis of the 'Plan of Development' for any proposed recreation resort." (*Id.* at 27.) The Memorandum of Understanding provided for how the agencies would cooperate in preparing an Environmental Impact Statement to review the effects of a proposal. (*Id.* at 28.)

By February 1991, the federal, state, and local agencies "decided not to spend any more time or money investigating a proposed destination ski resort" in the Lolo Peak Area. (*Id.* at 31.) A newspaper article on February 8, 1991, reported Forest Service and local officials concluded there was not enough snow in the Lolo Peak Area and there were already sufficient ski areas in the region to satisfy regional demand. AR1244.

**Tom Maclay's attempts to develop skiing in the Lolo Peak Area.**

Tom Maclay ("Maclay") and his family owned a historic ranch, dating back to 1872, adjacent to the Forest Service lands in the Lolo Peak Area. (Doc. 1 at 14.) Starting in 1999, Maclay and various entities controlled by him began submitting numerous proposals to the Forest Service for permission to use Forest Service lands for skiing and other recreational uses. From April 1999 to 2013, Maclay and his entities submitted "at least eighteen" proposals (none of which were approved) to the Forest Service for special use permits for skiing and other recreational uses in the Lolo Peak Area.[1] (Doc. 21 at 12.)

---

[1] In April 1999, Maclay proposed "outfitter guide helicopter skiing" in the Lolo Peak Area, and the Forest Service rejected the proposal. (Doc. 21 at 12.) In 2002 and 2003, Maclay submitted a proposal for heli-skiing and Nordic skiing; the Forest Service rejected the proposal. (*Id.* at 12–13.) In 2003 and 2004, Maclay submitted another proposal for "lift-served skiing" and cross-country skiing; the Forest Service rejected the proposal. (*Id.* at 13–14.) Maclay was "encouraged [by the Forest Service] not to expend resources on a ski area proposal until the Forest Plans were revised." (*Id.* at 14.) In late 2004, Maclay submitted a more ambitious proposal for a full-scale resort in the Lolo Peak Area; the Forest Service rejected the proposal during its initial screening and advised Maclay that any proposal "must be compatible with the

**Plaintiffs submit the Proposal at issue in this case.**

In May 2013, the Lolo National Forest and Bitterroot National Forest received a proposal ("the Proposal") from Maclay as Manager of Plaintiff Special Use Permit for Public Resort Benefits, LLC. (*Id.* at 21.) In June 2013, the Forest Service began its initial screening of the Proposal. (*Id.* at 22.) On August 16, 2013, in a joint letter ("the Denial"), the Lolo National Forest and Bitterroot National Forest denied the request for a special use permit described in the Proposal because the Proposal "did not meet current Forest Plan management direction." (*Id.*)

On September 4, 2013, Maclay filed an appeal with the Regional Forester, Faye Krueger, requesting an administrative appeal of the Denial. (*Id.*) On September 20, 2013, Krueger sent a notice ("the Rejection of Request for Appeal") to Maclay, informing him he and his entity were not entitled to an

---

Forest Plan." (*Id.* at 14–17.) In 2005 and 2006, Maclay submitted multiple proposals for cross-country skiing, as well as proposals for full-scale resorts, that were rejected. (*Id.* at 17–19.) These proposals were rejected in part because of a legal complaint against Maclay for unauthorized clearing of roads on Forest Service lands. (*Id.* at 19.) In 2007, a Maclay proposal for "minimal impact skiing" was rejected because of the ongoing legal dispute over Maclay's alleged road clearing. (*Id.*) In 2008, a Maclay proposal for "summer and winter recreation improvements" in the Lolo Peak Area was rejected during an initial screening by the Forest Service, and two amendments of the same proposal were also rejected in 2008. (*Id.* at 20.) Four years passed with no further Maclay proposals. Then, in 2012, Maclay revised his 2008 proposals for cross-country skiing, mountain biking, and snowcat-served downhill skiing. The Forest Service rejected this proposal in 2012 during its initial screening. (*Id.* at 20–21.) In early 2013, Maclay lost his family ranch to foreclosure. (Doc. 1 at 17.)

administrative appeal under Forest Service regulations because none of the criteria for appealable decisions were present. (*Id.*); AR4242. The Rejection of Request for Appeal stated that "no proposal for ski area development" in the Lolo Peak Area "[can meet] or be made to meet current Forest plan direction." (Doc. 21 at 22.) Krueger's notice also stated that it "does not make sense to undertake a significant [Forest] Plan amendment" because the Lolo National Forest had scheduled a revision of the Lolo National Forest Plan for 2016. AR4242. According to Krueger, the proper time to consider changing the Lolo National Forest Plan to allocate lands for skiing would be during the 2016 revision process. *Id.* Plaintiffs filed this suit in December 2013, seeking declaratory and injunctive relief from the Denial and from the Rejection of Request for Appeal. (Doc. 1 at 27.)

## LEGAL STANDARD

A party is entitled to summary judgment if it can demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary

judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered.  *Id.* at 248.

I. **Jurisdiction**

For jurisdiction to exist over Plaintiffs' claim, Plaintiffs must have exhausted their administrative remedies, and the Denial must constitute final agency action.

A. **Exhaustion of Administrative Remedies**

Before a plaintiff is entitled to judicial review, it is well-established that the plaintiff must exhaust all administrative remedies to provide the agency "'an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.'"  *Tamosaitis v. URS Inc.*, 771 F.3d 539, 548 (9th Cir. 2014) (quoting *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975)).  If a plaintiff has not exhausted all administrative remedies, the district court does not have subject matter jurisdiction to hear the plaintiff's claim.  *Id.*

If the Rejection of Request for Appeal was correct, Plaintiffs have exhausted their administrative remedies.  If it was incorrect, Plaintiffs must follow the procedure for administrative appeals described in Forest Service regulations

before bringing this action. *See* 36 C.F.R. § 214. Under the Administrative

Procedure Act, courts must "set aside agency action" that is found to be "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2). Review under the "arbitrary and capricious" standard is narrow,

and a district court may not substitute its judgment for that of the agency. *U.S.*

*Postal Serv. v. Gregory*, 534 U.S. 1, 6–7 (2001).

Under 36 C.F.R. § 214.4, a decision by the Forest Service to reject a special

use permit is appealable only if it falls into one of several categories. Only one

category is potentially relevant here: "Denial of a special use authorization to a

solicited applicant based on the process used to select a successful applicant." 36

C.F.R. § 214.4(c)(2). The term "solicited applicant" is defined as "[a]n individual

or entity that has submitted a competitive application in response to a prospectus."

36 C.F.R. § 214.2. A "prospectus" is defined as "[a]n announcement published by

the Forest Service soliciting competitive applications for a written authorization."

*Id.* Because the term "prospectus" is defined in regulations promulgated by the

Forest Service, the agency is entitled to broad deference in its interpretation.

*Thomas Jefferson U. v. Shalala*, 512 U.S. 504, 512 (1994) ("Our task is not to

decide which among several competing interpretations best serves the regulatory

purpose. Rather, the agency's interpretation must be given controlling weight

unless it is plainly erroneous or inconsistent with the regulation." (internal

quotation marks and citations omitted)).

Plaintiffs insist they are a "solicited applicant" because the Prospectus

constitutes a "prospectus" for the purposes of 36 C.F.R. § 214.2. The Forest

Service disagrees and insists that the Prospectus was not "published by the Forest

Service," as required under 36 C.F.R. § 214.2, and that its agreement to review

proposals did not render it the agency that issued the Prospectus. (Doc. 22 at 3.)

The Forest Service is correct. The Prospectus was "prepared by" Missoula

Economic Development Corporation "in cooperation with" several entities:

Montana Power Company, Lolo Peak Economic Research Committee, Lolo

National Forest, Missoula County, and Champion International Corporation.

AR0903. The cover letter to the Prospectus is on Missoula Economic

Development Corporation letterhead and is signed by its president. AR905–06.

The cover letter states that Missoula Economic Development Corporation "is

inviting developers to explore the possibility" of a ski area development in the

Lolo Peak Area and "is seeking developers who may be interested" and that the

Missoula Economic Development Corporation "will review all development

proposals." *Id*. The cover letter states that after reviewing all proposals Missoula

Economic Development Corporation, "with the concurrence of Champion

International, will recommend a developer to [the Forest Service] and Missoula County, which ultimately must issue the necessary permits to proceed." *Id.* The cover letter instructs "developers interested in responding to this solicitation" to respond to a contact at Missoula Economic Development Corporation. *Id.* It also provides that "parties interested in additional information" may contact individuals at the Forest Service, Missoula County, and Champion International. *Id.* After the cover letter, the Prospectus is silent as to which entity is responsible for the creation, publication, or dissemination of the Prospectus or which entity is responsible for the review of proposals.

Since the Prospectus includes no evidence of being "published by the Forest Service," the Memorandum of Understanding must be reviewed. The "purpose and intent" of the Memorandum of Understanding is "to establish a cooperative procedure" between the Lolo National Forest, Missoula Board of County Commissioners, and Montana Department of State Lands "concerning Joint Review and Analysis of the 'Plan of Development' for any proposed recreation resort concerning joint jurisdiction of the Parties to this document." AR989. The Memorandum of Understanding commits the Forest Service to various tasks, the most relevant of which is to "[i]ndependently evaluate the information submitted by consultants and the proponent *for its adequacy and accuracy from the Forest*

*Service perspective*." AR992 (emphasis added). At no point does the Memorandum of Understanding provide that a prospectus issued by another entity might constitute a prospectus under the Forest Service regulations, nor that the Forest Service intends to solicit competitive applications for a ski area. That the Prospectus and the Memorandum of Understanding mention the Forest Service's roles in cooperating with the author of the Prospectus and in reviewing proposals for "accuracy from the Forest Service perspective" does not amount to the Forest Service having published an announcement intended to solicit competitive applications.

Further, the Forest Service is entitled to deference in its interpretation of its own regulations unless its interpretation is "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson U.*, 512 U.S. at 512. In its Rejection of Request for Appeal, the Forest Service summarizes the crucial factors to its interpretation of the regulation; most importantly, that the Prospectus was issued by the Missoula Economic Development Corporation and not by the Forest Service. AR4242. Thus, the Forest Service's decision to reject Plaintiffs' appeal was not an abuse of discretion because it was made pursuant to the relevant facts in the record and cited specific reasons why the Prospectus cannot be considered to have been "published by the Forest Service." *Id.* Because the Prospectus was not

published by the Forest Service, the Proposal cannot be considered a "competitive application," and Plaintiffs cannot be considered a "solicited applicant." Consequently, Plaintiffs have no right to appeal the Denial, and they have exhausted their administrative remedies.

## B.    Final Agency Action

Under the Administrative Procedure Act, a person "suffering legal wrong because of agency action" is entitled to judicial review.  5 U.S.C. § 702.  Agency actions that are subject to judicial review are limited to "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.  Courts have no jurisdiction to review any actions other than final agency action.  *Id.*  To constitute "final agency action," an act or failure to act must "'mark the consummation of the agency's decisionmaking process,'" and the action "'must be one by which rights or obligations have been determined, or from which legal consequences will flow.'"  *Wild Fish Conservancy v. Jewell,* 730 F.3d 791, 801 (9th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Courts have held that an agency's decision not to issue a special use permit constitutes "agency action" under the Administrative Procedure Act.  *Drakes Bay Oyster Co. v. Salazar*, 921 F. Supp. 2d 972, 984 (N.D. Cal. 2013), *aff'd on other grounds*, *Drakes Bay Oyster Co. v. Jewell*, 729 F.3d 967 (9th Cir. 2013).  Where

an agency has promulgated "precise qualifications for permittees," courts may review whether the agency "properly considered the promulgated factors." *Id.* at 987 (citing *KOLA, Inc. v. United States*, 882 F.2d 361, 364 (9th Cir. 1989)).

Here, the Forest Service promulgated regulations that create "precise qualifications" for screening proposals for special use permits. *Id.*; 36 C.F.R. § 251.54(e). In the Denial, the Forest Service followed the precise qualifications contained in its regulations. The Denial is a "consummation" of the Forest Service's decision-making process, making it clear that Plaintiffs are not entitled to a special use permit. *Wild Fish Conservancy*, 730 F.3d at 801; AR4224. As a result, the Denial constitutes final agency action, and jurisdiction exists to review whether the Forest Service properly considered the factors listed in the regulation.

## II.     Lawfulness of the Agency Action

### A.     Standard

Under the Administrative Procedure Act, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Agency action should be overturned "only when the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Safari Aviation Inc. v. Garvey*, 300 F.3d 1144, 1150 (9th Cir. 2002) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The district court's review is narrow, but it must be "searching and careful." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). The district court must ensure the agency articulated a "rational connection between the facts found and the choice made." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgt.*, 273 F.3d 1229, 1236 (9th Cir. 2001).

### B. Relevant Statutes and Regulations

NFMA requires the Forest Service to "develop . . . land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). Once a plan has been developed and promulgated, "permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(I); 36 C.F.R. § 254.54(e)(1)(ii).

The National Forest Ski Area Permit Act of 1986 authorizes the Secretary of Agriculture to issue permits for the use of Forest Service lands for "skiing and other snow sports and recreational uses." 16 U.S.C. § 497b(b). However, any

permit issued for such uses "shall . . . be authorized in accordance with the applicable land and resource management plan." 16 U.S.C. § 497b(c)(2)(D). Agency regulations permit the Chief of the Forest Service, or other agency officials, to issue special use permits for uses including "[o]peration of nordic and alpine ski areas." 36 C.F.R. § 251.53(n).

The Forest Service promulgated regulations describing in detail its process for considering applications for permits. 36 C.F.R. § 251.54. It created a two-tiered system of review. First, the agency conducts an "initial screening" of a proposal for a special use permit. 36 C.F.R. § 251.54(e)(1). During the initial screening, the agency must "ensure that the use meets . . . [nine] minimum requirements applicable to all special uses." *Id.* The second minimum requirement is that the "proposed use is consistent or can be made consistent with standards and guidelines in the applicable forest land and resource management plan" under NFMA. 36 C.F.R. § 251.54(e)(1)(ii). If a proposal does not meet all of the nine minimum requirements, it "shall not receive further evaluation and processing." 36 C.F.R. § 251.54(e)(2). If a proposal passes the initial screening phase, it then proceeds to second-level screening, which involves a more detailed description of the proposed use and, if applicable, analysis under the National Environmental Policy Act. 36 C.F.R. § 251.54(e)(5).

The regulations are silent as to how thoroughly the Forest Service should analyze a proposal during its initial screening.  However, when the Forest Service drafted its regulations, it responded as follows to one public comment that the initial screening process would merely add time to an already-lengthy process: "[T]he screening process is expected to reduce the burden by preventing unsuitable or inconsistent projects from proceeding to full-scale applications.  The screening process would require only a very simple abstract of the proposed use and *would not require a lengthy analysis* by the authorized officer."  63 Fed. Reg. 65950-01, 65954 (Nov. 30, 1998) (emphasis added).

### C.  Inclusion of a Ski Area in the Lolo and Bitterroot National Forest Plans

Plaintiffs insist the Forest Service "carried the Carlton Ridge ski area concept . . . forward into the 1986 Lolo National Forest Plan."  (Doc. 21 at 3.) According to the Forest Service, however, the Lolo National Forest Plan does not allocate lands to ski area development or commit the agency to ski area development.  (Doc. 17 at 14.)

Neither the Lolo National Forest Plan nor the Bitterroot National Forest Plan allocate any land in the Lolo Peak Area to ski area development.  In the Lolo National Forest Plan, lands allocated for ski areas are placed in Management Area 8, entitled "ski areas."  AR4497.  In the Bitterroot National Forest Plan, lands

allocated for ski areas are placed in Management Area 10, for "developed recreation sites" including campgrounds, boat launching facilities, picnic areas, and a single ski area, Lost Trail Ski Area. AR11000. No lands in the Lolo Peak Area were allocated as part of Management Area 8, "ski areas," in the Lolo National Forest Plan. AR4499. No lands in the Lolo Peak Area were allocated as part of Management Area 10 in the Bitterroot National Forest Plan. AR11121. Plaintiffs are correct to argue that the Lolo National Forest Plan mentions the potential for ski area development in the Lolo Peak Area; however, the Forest Service cannot approve a permit to develop a ski resort in the Lolo Peak Area without amending the Forest Plans.

**D.    Whether the Action was Arbitrary and Capricious**

Plaintiffs' Proposal was rejected at the initial screening because it was inconsistent with the Lolo and Bitterroot National Forest Plans. The Forest Service's Denial listed five specific areas of inconsistency between the Proposal and the Forest Plans. Each area of inconsistency relates to a different "Management Area" described in one of the Forest Plans. The crucial question under each area of inconsistency is whether the Proposal is consistent with, or can be made consistent with, the standards and objectives of the relevant Forest Plan. *See* 36 C.F.R. § 251.54(e)(1)(ii). As explained below, the Forest Service followed

the proper guidelines for initial screening as well as the standards in the National

Forest Plans.

### 1. Management Area 11 in the Lolo National Forest Plan

As a preliminary matter, the parties dispute whether, or to what extent, the

Proposal includes lands within Management Area 11. Plaintiffs claim the

Proposal has "no potential connection to [Management Area 11] until a 'potential

future phase,'" (Doc. 12 at 11), and that Phase 1 of the Proposal is "submitted as a

possible standalone (like all the proposed phases)," (Doc. 20 at 10). The Forest

Service insists the Proposal does not refer to the various phases of development as

standalone, and that, as a result, the Forest Service considered the Proposal as one

single proposal. (Doc. 22 at 4–5.)

The map attached to the Proposal, reviewed in conjunction with the map

attached to the Lolo National Forest Plan showing the boundaries of the

Management Areas, demonstrate that substantial portions of "Future Phase 4" and

"Potential Future Phases" of the Proposal lie within Management Area 11.

AR4216; AR4499. Further, the Proposal includes no statement that each phase

should be reviewed as a standalone proposal. The Proposal does state that the

phases "may or may not occur in the order listed below," where they are listed in

order of phase number. AR4203. But that does not put the Forest Service on

notice that some phases may not occur or that some may occur as standalone phases. The Forest Service properly reviewed the Proposal as a whole and properly concluded that portions of the proposed ski area lie within Management Area 11.

In the Denial the Forest Service concludes that "[s]ki area construction is incompatible with" Standards 2, 4, and 8 listed in Management Area 11 in the Lolo National Forest Plan. AR4224–25. The Forest Plan provides, "This Management Area consists of *large*, *roadless blocks* of land distinguished primarily by their natural environmental character. . . . There is *no motorized access* permitted in this Management Area except for development of mineral resources. Public use may be restricted." AR4563 (emphasis added). The goals for Management Area 11 include providing for "a wide variety of *dispersed* recreation activities in a near-natural setting," and "old-growth dependent wildlife species." *Id.* (emphasis added). Standard 2 states that "*developed recreation facilities, like campgrounds or picnic grounds, will not be constructed*." *Id.* (emphasis added). Standard 4 states that "tree cutting will be limited to that required to eliminate safety hazards or permit trail construction." *Id.* Standard 8 states, "Management practices will follow guidelines for the Retention visual

quality objective[.]"[2]  *Id.*

The Forest Service correctly concluded that the Proposal is inconsistent

with the goals and standards of Management Area 11 in the Lolo National Forest

Plan.  First, the Proposal would call for snowcat skiing, which constitutes

motorized access in an area where motorized access is prohibited except for

mineral extraction.  Second, it would call for public use in an area where public

use is restricted.  Third, a ski resort would create concentrated, not dispersed,

recreation.  Finally, it would involve the construction of developed recreation

facilities, such as ski lifts and a lodge.  The Forest Service articulated reasons in

the Denial why the Proposal is inconsistent with Management Area 11, and its

---

[2] The Lolo National Forest Plan includes in its forest-wide objectives the following
statement regarding visual quality:

> At the present time, approximately 80 percent of the Forest has a relatively
> natural appearance. Resource management activities are significantly
> constrained by visual quality objectives in areas adjacent to or readily visible
> from major highways, roads, trails, campgrounds, and other recreational
> developments. Other parts of the Forest where visual quality objectives
> constrain resource management activities are identified; the Forest Plan
> continues management that insures those natural-appearing landscapes.

AR4510.  The Bitterroot National Forest Plan also has a forest-wide goal regarding visual
quality: "Maintain a high level of visual quality on landscapes seen from population
centers and major travel routes, and adjacent to fishing streams."  AR10900.

The Forest Plans define "Visual Quality Objective" as "a desired level of scenic
quality and diversity of natural features based on physical and sociological characteristics
of an area. [It] refers to the degree of acceptable alterations of the characteristic
landscape."  AR4846; AR11077.  Each Forest Plan lists six different objectives in a
hierarchy from the most pristine to the least pristine: Preservation, Retention, Partial
Retention, Modification, Maximum Modification, and Enhancement.  *Id.*  "Retention" is
defined as follows: "Human activities are not evident to the casual visitor."  *Id.*

interpretation of the goals and standards included in the Lolo National Forest Plan was not arbitrary or capricious.

## 2. Management Area 24 in the Lolo National Forest Plan

The Denial concludes that the Proposal is inconsistent with Goal 1 and Standard 23 of Management Area 24 in the Lolo National Forest Plan. AR4225. The Denial states, "The photograph of existing ski runs on private property included in your proposal does not demonstrate how ski lifts and ski runs in Phase III would be consistent" with Goal 1 and Standard 23. *Id.* The Lolo National Forest Plan provides that Goal 1 of Management Area 24 is to "[a]chieve the visual quality objective of Retention." AR4651. Standard 23 calls for management practices "for all resources" to "follow guidelines for the Retention visual quality objective from the viewpoints identified as visually sensitive." AR4653–54. The standard allows for temporary departures from the visual quality only if the long-term visual quality requires such action or if the action is necessary for "essential road access into other management areas." AR4654.

Plaintiffs insist the Forest Service did not analyze the Proposal sufficiently to conclude that the visual quality objective would be violated by the development of a ski area. (Doc. 12 at 15.) They claim the Forest Service conducted "no study or on-the-ground analysis" regarding the effect of the Proposal on the visual

quality objective and the Forest Service arbitrarily determined that skiing infrastructure "is categorically unacceptable from a visual perspective," even though Management Area 24 allows for extensive roads, which can affect the visual quality objective. (*Id.* at 15–16.) Yet, the Forest Service had no obligation to conduct further analysis during its initial screening because the initial screening is intended to require "only a very simple abstract of the proposed use and [does] not require a lengthy analysis." 63 Fed. Reg. at 65954. The Denial explains that the Forest Service considered the photographs of existing ski runs in its analysis and concluded that similar ski runs within Management Area 24 would compromise the visual quality objective. AR4225. The Forest Service's brief analysis, and its reliance on photographs included in the Proposal, constitute an acceptable application of the initial screening procedure provided in 36 C.F.R. § 251.54(e).

Plaintiffs also argue that Management Area 24 permits significant human activities, including "an extensive road system, timber production, livestock grazing, trails, mining, and other recreational uses," and as a result, ski area development should be acceptable. (Doc. 12 at 14–15.) Plaintiffs' argument implies that other approved uses of Management Area 24 are in violation of Standard 23, which applies to "all resources." AR4225. However, the Forest

Service is not required during an initial screening to consider whether there are existing uses that are in conflict with the Forest Plan. 36 C.F.R. § 251.54(e). The Forest Service need only ask whether a proposed use is "consistent or can be made consistent with" the Lolo National Forest Plan. 36 C.F.R. § 251.54(e)(1)(ii). The Forest Service properly considered this question and concluded that the Proposal is inconsistent with the goals and standards of Management Area 24. The Forest Service is entitled to broad deference in its interpretation of its regulations. *Thomas Jefferson U.*, 512 U.S. at 512. Its determination that the Proposal is not "consistent with" the visual quality objective of Retention within Management Area 24 was not arbitrary or capricious.

### 3. Management Area 6, the Research Area, in the Lolo National Forest Plan

The Denial states that although the Proposal does not involve any use of Management Area 6, it involves ski lifts and ski runs "directly adjacent to the eastern, western and northern boundaries" of the Research Area. The Denial explains that the proposed development "would bring a high potential for non-permitted, concentrated recreation use" within the Research Area "with no discussion on how this could be avoided." AR4225. The Denial concludes that the Proposal is inconsistent with the preservation of the Research Area's "natural, historic condition." *Id.*

-27-

The Lolo National Forest Plan acknowledges that the Lolo Peak Area "has the potential for a ski area of national class. The location appears to contain sufficient room for both" the ski area and the Research Area. AR4548. The goal of Management Area 6 is to "provide areas for nonmanipulative research . . . of undisturbed ecosystems which typify important forest . . . or unique vegetation types on the Lolo National Forest." AR4549. Standard 10 allows for the coexistence of a ski area and the Research Area:

> The [Research Area] proposal should not preclude the development of the potential ski area on the north slopes of Lolo Peak and Carlton Ridge. The establishment report for this [Research Area] must discuss alternatives available for making the [Research Area] compatible with the potential ski area development while ensuring retention of the principal research opportunities.

AR4550. Standard 12 states, "No special-use permits will be allowed unless the proposed use is clearly compatible with the objectives of the Management Area." *Id.*

Plaintiffs claim that because the Lolo National Forest Plan clearly states that the Research Area does not preclude use of nearby lands for a ski area, the Forest Service intended to prioritize the potential ski area above the Research Area. They further insist that the Proposal respects and would not harm the Research Area. (Doc. 12 at 17–18.) The Forest Service highlights that the Proposal "failed to consider the potential effects of a ski resort that surrounded the [Research Area]."

(Doc. 15 at 22.)  The Forest Service further explains that its internal Forest Service

Manual requires the agency to protect research natural areas "against activities that

directly *or indirectly* modify ecological processes" and to "prohibit any form of

recreation use if such use threatens or interferes with the objectives or purposes for

which the research natural area is established."  (*Id.* at 26–27 (emphasis in

original)).  Therefore, the Forest Service may not permit a recreational use that

will directly or indirectly modify the Research Area, and any permitted

recreational use must be clearly compatible with the objectives of the Research

Area.  (*Id.*)

The Forest Service's analysis that the development contemplated by the

Proposal "would bring a high potential for . . . concentrated recreation" within the

Research Area is supported by record.  *Id.*; AR4225.  The map attached to the

Proposal includes ski runs in Phase 1 of the development directly to the south of

the Research Area; ski runs and a ski lift in Phase 1 directly to the east of the

Research Area; an alternate ski lift in Phase 3 directly north of the Research Area;

and a ski run and a ski lift in Phase 4 directly west of the Research Area.  AR4216.

The boundaries of Management Area 6 coincide with the boundaries of Phases 1,

3, and 4 in the Proposal.  *Id.*  The map shows the "Proposed Phase 1 Base Area" in

close proximity to the northeast corner of the Research Area, and the "Proposed

Phase 3 Base Area" somewhat close to the north boundary of the Research Area.
*Id.* Because the Proposal includes ski lifts or ski runs in close proximity to all four
sides of the Research Area and two base areas close to the boundaries of the
Research Area, and because the Proposal included no discussion on how to avoid
unauthorized use of the Research Area, the Forest Service acted in accordance
with the law in concluding that the Proposal is not "clearly consistent" with the
goal and standards of the Research Area.

### 4. Management Area 3a in the Bitterroot National Forest Plan

The Denial states that "ski runs in [Management Area 3a] would not be
subordinate [to] the landscape," AR4226, and it points out that the Proposal "calls
for ski lifts, ski runs and a lodge within [Management Area 3a]." *Id.* The
Bitterroot National Forest Plan describes Management Area 3a as being "in the
visually sensitive foreground and middleground viewing areas along U.S.
Highway 93." AR10946. The visual quality retention goal for the Bitterroot
National Forest as a whole is to maintain "a high level of visual quality on
landscapes seen from population centers and major travel routes." AR10900. The
specific goal for Management Area 3a is to "[m]aintain the partial retention visual
quality objective[3] and manage timber. Emphasize roaded dispersed recreation

---

[3] The Bitterroot National Forest Plan defines the visual quality objective of "Partial
Retention" as follows: "Human activities may be evident, but must remain subordinate to the

activities, old growth, and big-game cover. . . . Restrict road density where necessary to meet visual objectives but provide access as needed for mineral exploration." *Id.*

Plaintiffs assert that the determination of whether a use would violate the visual quality objective is a "fact-intensive determination" and that the Forest Service did not conduct enough analysis to reach its conclusion. (Doc. 20 at 13.) In Plaintiffs' view, the Proposal did not include enough information for the Forest Service to conclude that ski area development in Management Area 3a would be visible from population centers or major travel routes. (Doc. 12 at 20.) According to the Forest Service, it based its conclusion on its observation of the ski runs previously constructed on the ranch formerly owned by Maclay and determined "there is no question that the agency correctly concluded that the proposal will not meet the 'Partial Retention' standard." (Doc. 15 at 30.) Again, the Forest Service conducted sufficient analysis for an initial screening because an initial screening does "not require a lengthy analysis." 63 Fed. Reg. at 65954. The Denial concludes that the ski runs in Management Area 3a "would not be subordinate" to the landscape. AR4226. The Forest Service's brief analysis, and its reliance on a photograph included in the Proposal, constitute an acceptable application of the

_____

characteristic landscape." AR11077.

initial screening procedure.

Plaintiffs say the Forest Service "arbitrarily assume[d]" that ski area development in Management Area 3a would be visible from population centers or major travel routes. (Doc. 12 at 20–21.) The Proposal did not include specific information about how visible the ski lifts and ski runs would be from population centers and highways. However, the Proposal calls for a base area, multiple ski runs and a ski lift terminating in Management Area 3a. The Forest Service reasonably concluded that the quantity of ski lifts, ski runs, and lodges described in the Proposal would be unlikely to remain "subordinate to the landscape." AR4226. The decision reached by the Forest Service falls within the broad discretion with which it may interpret its regulations—here, it is interpreting the phrase "subordinate to the landscape"—in deciding whether or not to issue a special use permit. The decision was based on a reasonable interpretation of the Bitterroot National Forest Plan and was not arbitrary or capricious.

### 5.    Management Area 5 in the Bitterroot National Forest Plan

The Denial provides that the ski lifts, ski runs, and lodge that would be constructed within Management Area 5 of the Bitterroot National Forest Plan are "incompatible with both the recreation and visual quality standards" for Management Area 5. AR4226. The goal of Management Area 5 is to

"[e]mphasize motorized and nonmotorized semiprimitive recreation activities and elk security." AR10968. Standard 3.a(1) instructs the Forest Service to "[m]anage for recreation activities associated with roadless areas, including hiking, hunting, fishing, camping, motorbiking, and snowmobiling." *Id.* Standard 3.a(4) states that "facilities and trails will be compatible with the semi-primitive setting." *Id.* Under Standard 3.b(1), "the visual quality objective is retention." AR10969.

At the outset, the parties disagree to what extent the Proposal includes improvements within Management Area 5. According to Plaintiffs, the Proposal "may at most touch the tip" of Management Area 5 "with the very end of a ski lift." (Doc. 12 at 21.) And if the Forest Service determines that the tip of Management Area 5 cannot be crossed by a ski lift, Plaintiffs claim the Proposal provides an alternate location for the ski lift. (*Id.* at 22.) The Forest Service argues that "a comparison of Plaintiffs' proposal with the Bitterroot Forest Plan Management Area map reveals that substantial ski area developments would occur within" Management Area 5. (Doc. 15 at 13.) A comparison of the map attached to the Proposal and the map attached to the Bitterroot National Forest Plan demonstrates that substantial portions of "Phase 1" and "Phase 2" lie within Management Area 5. AR4216; AR11121.

Plaintiffs insist that the improvements called for in the Proposal in

Management Area 5 are "not visible from either of the two primary viewing corridors." (Doc. 12 at 23.) The Forest Service responds that the explanation it provided in the Denial "is both well-reasoned and logical" because the ski lifts and ski runs would not conform to the "semi-primitive setting" envisioned for Management Area 5. (Doc. 15 at 17.) The Forest Service again references the photographs of ski runs already constructed on the ranch formerly owned by Maclay, which "are currently obvious to the casual observer and not subordinate to the natural landscape." (*Id.*)

The Forest Service's conclusion that the Proposal is inconsistent with the standards of Management Area 5 was reasonable, and the agency articulated a rational connection between the provisions in the Proposal and the decision made. The brief analysis conducted by the Forest Service was appropriate for an initial screening. According to the map attached to the Proposal, the development contemplated by the Proposal would include within Management Area 5 three ski lifts in Phase 1 and one ski lift in Phase 2, several ski runs, and two base areas. AR4216. The Denial stated why the Proposal was inconsistent with the Bitterroot National Forest Plan: because the "facilities and improvements" in the Proposal are "incompatible with both the retention and visual quality standards" in Management Area 5. AR4226. Thus, the Denial was based upon adequate

reasoning and was not arbitrary or capricious.

Accordingly, IT IS ORDERED that Defendants' Cross Motion for Summary Judgment (Doc. 14) is GRANTED. Plaintiffs' Motion for Summary Judgment (Doc. 10) is DENIED.

IT IS FURTHER ORDERED that the Clerk of Court is directed to enter judgment and close this case.

DATED this 11th day of May, 2015.

DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT